# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### ST. JOSEPH DIVISION

JAYME FLAWS,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　)　　　　**Case No. 19-06140-CV-SJ-GAF**
　　　　　　　　　　　　　　　　　)
AKAL SECURITY, INC.,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　)

## ORDER

Now before the Court is Defendant Akal Security, Inc.'s ("Akal" or "Defendant") Motion for Summary Judgment. (Doc. # 54). Plaintiff Jayme Flaws ("Plaintiff") opposes. (Doc. # 62). For the following reasons, Defendant's Motion is GRANTED in part and DENIED in part.[1]

## DISCUSSION

### I.  FACTS

### A.  Background

On March 1, 2015, Akal took over the contract with the Transportation Security Administration ("TSA") to provide security screening services at the Kansas City International Airport (the "Airport" or "KCI"). (Doc. # 55-1, 13:6-15, 37:19-38:2; Doc. # 55-2, 80:17-19). TSA required Akal to abide by all TSA requirements for security officers at the Airport. (Doc. # 55-1, 37:19-38:2; Doc. # 55-2, 80:20-81:4). TSA has published Medical and Psychological Guidelines for Transportation Security Officers (the "TSA Guidelines"), which contain the essential job

---

[1] Also pending is Defendant's Motion for Leave to File Supplemental Authority. (Doc. # 67). Plaintiff opposes. (Doc. # 68). Upon consideration of the parties' arguments, the Court GRANTS Defendant's Motion for Leave to File Supplemental Authority. The Court has considered the parties' arguments concerning the implications of *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539 (8th Cir. 2021), in reaching the decisions in this Order.

functions for transportation security officers and are the TSA's "management directive on qualifications from a government side." (Doc. # 55-2, 81:20-82:8; Doc. # 55-3, 75:17-22; Doc. # 55-5, pp. 30-35). Akal employees must meet the TSA Guidelines to be hired and work as a security officer. (Doc. # 55-2, 82:1-8). Akal has no discretion to waive or not follow the TSA Guidelines; if an employee cannot meet the TSA Guidelines, they cannot be hired. (Doc. # 55-2, 82:6-15). Akal also uses the TSA Guidelines when determining an employee's fitness for duty. (Doc. # 55-3, 76:15-22). When an employee's medical status changes, Akal provides the TSA Guidelines to the physician performing the fitness-for-duty examination to ensure that the employee can still perform the essential functions of the job. (Doc. # 55-3, 77:20-78:9).

Transportation Security Officers ("TSOs") are the front line of security at KCI and interact with passengers throughout the Airport. (Doc. # 55-1, 13:24-14:17). Among other things, TSOs check passenger identification, check tickets, conduct X-ray and metal detector screens, work the body scanners, and monitor the exits. (Doc. # 55-1, 13:24-14:17). TSOs report to Lead TSOs. (Doc. # 55-1, 14:18-25). Lead TSOs generally have the same responsibilities as TSOs with a few additional responsibilities. (Doc. # 55-1, 35:7-36:10). Lead TSOs report to Supervisory TSOs. (Doc. # 55-1, 14:18-25). Supervisory TSOs report to Terminal Managers. (Doc. # 55-1, 14:18-25). Terminal Managers are the highest-ranking employees who work at the Airport's terminals. (Doc. # 55-1, 15:2-12). KCI had less than ten Terminal Managers. (Doc. # 55-1, 31:16-32:3). The Terminal Managers reported to Jacob Sledd, who was the Director of Airport Operations from January 2016 to late 2016 and then the Deputy Program Manager thereafter. (Doc. # 55-2, 11:3-12:8, 14:4-7).

Akal hired Plaintiff as a TSO, effective March 1, 2015, when Akal took over the contract with TSA. (Doc. # 55-1, 15:24-16:17; Doc. # 55-6). Plaintiff had been working at the Airport as

a TSO for nearly two years beforehand. (Doc. # 62-1, 13:5-23). Plaintiff became a Lead TSO at some point in 2015, possibly as early as March 2015. (Doc. # 55-1, 24:5-25:4). Akal promoted Plaintiff to Supervisory TSO as of August 3, 2015, and she remained in that position until her employment with Akal ended. (Doc. # 55-1, 27:3-14). Plaintiff viewed her main job responsibilities as a Supervisory TSO to supervise the TSOs and Lead TSOs, address security issues raised by the TSOs and Lead TSOs, contact TSA when necessary, and generally ensure that everyone was safe. (Doc. # 55-1, 25:2-7, 36:11-37:13).

Plaintiff worked at KCI's security checkpoints. (Doc. # 55-1, 33:11-20). During her shifts, Plaintiff supervised between nine and 24 TSOs and Lead TSOs. (Doc. # 55-1, 39:14-41:17). As a Supervisory TSO, Plaintiff did not report to a specific Terminal Manager but rather reported to whoever was on duty during her shift. (Doc. # 55-1, 31:16-32:3). The Terminal Managers worked in an office within the terminal and visited the checkpoint "usually once a day in the morning." (Doc. # 55-1, 33:11-20, 38:3-18). Additionally, Plaintiff would talk with them by phone at least once a day. (*Id.*).

## B.      Attendance Policy

Akal's attendance policy applied to Plaintiff. (Doc. # 55-1, 51:25-52:4; Doc. # 55-3, 63:10-16). Akal published the relevant attendance policy in July 2016. (Doc. # 55-2, 44:15-45:3; Doc. # 55-3, 63:2-63-9; Doc. # 55-8). The attendance policy stated:

> It is the officer's responsibility to report for duty on time, as scheduled. The following information defines instances where an officer will not fulfill the requirement to report for duty on time as scheduled. Please note that an officer may be subject to corrective action for a single incident of the following defined categories of absences.
>
> **Calling Off –** Notifying the [KCI] call center either of the officer's intention to either by tardy or be absent from the scheduled shift. This call must be made two (2) hours prior to the start of an officer's shift in order to be compliant with call-out procedures.

3

**Late-Call Off:** A call-off made within the two hour timeframe is considered a violation.

**Absence –** not showing up for scheduled shift.
  **Excused absence:** the following conditions are met:
  a) The officer schedules and is approved for [paid-time off ("PTO")] at least ten (10) days prior to the date of the leave.
  b) The reason for the request is found to be credible or acceptable by his/her supervisor;
  c) Such absence request is approved by supervisor;
  d) Officer has sufficient PTO to cover the absence unless otherwise covered by other leave.

**Unexcused absence –** occurs when one of the four conditions above are not met.

      \*   \*   \*

**Tardy –** arrival after the start of their scheduled shift.

**Early departure –** leaving before end of scheduled shift including when on mandatory holdover.

**Excessive Attendance Issues:** All instances of tardiness, late call off and/or early departure will be tracked on a rolling five (5) week period. Four (4) instances or the establishment of a pattern of any combination of the above in a five (5) week period may result in corrective action. As noted above, an officer may be subject to corrective action for a single incident of any of the defined categories of absence.

(Doc. # 55-8, pp. 1-2).

Akal issued corrective action through a Personnel Action Report ("PAR"). (Doc. # 55-1, 53:3-22). Discipline under the written attendance policy contained the following progressive steps: (1) verbal warning/PAR; (2) written warning/PAR; (3) one-day suspension; (4) three-day suspension with final warning; and (5) removal from the schedule pending investigation. (Doc. # 55-2, 25:8-26:17; Doc. # 55-3, 66:1-18). Investigations usually resulted in discharge. (Doc. # 55-3, 67:6-21).

Akal also established what are known as "blackout days." (Doc. # 55-1, 49:6-50:2). A blackout day is a day that management, in its discretion, deemed to be a high travel day or a high

call-off day, like Christmas, Thanksgiving, the Super Bowl, or when big conferences came to Kansas City. (Doc. # 55-1, 49:6-50:2). Blackout days meant a stricter enforcement of the attendance policy because attendance was more critical. (Doc. # 55-1, 50:20-23). Under the blackout attendance policy, employees received an "Automatic PAR at the next progressive step to include removal from schedule." (Doc. # 55-9). Akal also had an unwritten policy for attendance at KCI that if an employee went six months without incurring any attendance violations, the employee would go back to the first progressive disciplinary step. (Doc. # 55-1, 55:6-11; Doc. # 55-2, 26:22-27:13).

Plaintiff acknowledged that, as a Supervisory TSO, it was important for her to know and be familiar with the attendance policies. (Doc. # 55-1, 53:23-54:5, 55:22-56:9). Generally, Plaintiff would provide Akal a doctor's note when she missed work and saw a physician because Akal usually excused absences accompanied by a doctor's note. (Doc. # 55-1, 67:15-68:8; Doc. # 55-3, 86:1-5).

## C.    Plaintiff's Absences & Attendance Violations

Plaintiff received a verbal warning/PAR on November 5, 2015, for calling off on a blackout day (Halloween 2015) without a doctor's note. (Doc. # 55-1, 56:10-57:7; Doc. # 55-10). Plaintiff signed the PAR and checked the box indicating she agreed with it. (*Id.*).

Plaintiff provided doctor's notes to Akal for absences on April 21 and 25, 2016. (Doc. # 55-1, 59:22-60:10, 61:8-12; Doc. # 55-11; Doc. # 55-12). Akal excused her for both absences. (*Id.*). However, Plaintiff received a written warning/PAR for calling out without available PTO on April 8, 2016. (Doc. # 55-1, 60:14-61:12; Doc. # 55-13). Plaintiff signed the PAR and checked the box indicating she agreed with it. (*Id.*). The PAR did not include the April 21 and April 25 doctor visits or any related absences. (*Id.*).

5

Plaintiff provided a doctor's note to Akal indicating Plaintiff had been seen by a physician on June 3, 2016 and clearing Plaintiff to return to work on June 5, 2016. (Doc. # 55-1, 61:13-25; Doc. # 55-14). Plaintiff also provided a doctor's note to Akal indicating Plaintiff had been seen by a physician on November 2, 2016, and that Plaintiff "needs to be on restricted duty for the next week." (Doc. # 55-1, 62:22-64:6; Doc. # 55-15). But Plaintiff received a one-day suspension for calling off on October 29, 2016 (a blackout day) without a doctor's note. (Doc. # 55-1, 64:18-65:8; Doc. # 55-16). Plaintiff signed the PAR and checked the box indicating she agreed with it. (*Id.*). The PAR did not include Plaintiff's June 3, 2016 or November 2, 2016 doctor visits or any related absences. (Doc. # 55-1, 65:20-66:6).

Plaintiff provided a doctor's note to Akal indicating Plaintiff had been seen by a physician on March 11, 2017 and excusing her from work on March 11 and 12, 2017 "due to a contagious illness." (Doc. # 55-1, 68:12-22; Doc. # 55-17). Plaintiff also provided a doctor's note to Akal indicating Plaintiff had been seen by a physician on May 27, 2017 and excusing her from work that day. (Doc. # 55-1, 69:1-8; Doc. # 55-18).

Plaintiff provided a doctor's note to Akal stating Plaintiff had been to the North Kansas City emergency room on June 3 and 4, 2017 and had been seen by a physician on June 7, 2017 relating to a miscarriage. (Doc. # 55-1, 69:9-71:12; Doc. # 55-29). The day Plaintiff miscarried, she informed Terminal Manager Danielle Beck. (Doc. # 62-1, 76:12-17). Plaintiff did not inform Sledd but he was otherwise informed and emailed her his condolences. (Doc. # 62-1, 76:24-77:18; Doc. # 62-3, 31:4-7). Sledd testified that Plaintiff should have been provided FMLA paperwork for the absences associated with her miscarriage. (Doc. # 62-3, 33:5-34:9). Akal did not provide Plaintiff with FMLA paperwork or otherwise inform her that FMLA could possibly excuse her absences. (Doc. # 62-1, 207:13-19). There is no evidence that Plaintiff requested FMLA leave

for the absences attributed to her miscarriage.  (*See generally* Docs. ## 55, 62, 63, and attachments thereto).

Plaintiff received a verbal warning/PAR on June 19, 2017.  (Doc. # 55-19).  The PAR states it was given because of unexcused absences on May 20, 23, 24, 27, and 30 and June 3-5 and 8-11, 2017 as well as an unapproved early out on May 22, 2017.  (*Id.*; Doc. # 55-1, 73:12-74:13).  At least four of those occurrences were unrelated to absences excused by the doctor's notes dated May 27, 2017 and June 7, 2017 (*i.e.*, occurrences on May 20, 22, 23, and 24).  (*Id.*).  Plaintiff testified she was absent May 20, 23, and 24 and left early on May 22 due to childcare issues.  (Doc. # 55-1, 73:21-74:13, 75:15-18).  Plaintiff signed the PAR and checked the box indicating she agreed with it.  (Doc. # 55-1, 76:3-8; Doc. # 55-19).  This PAR was a verbal warning because Plaintiff had gone more than six months since her last attendance PAR on November 8, 2016. (Doc. # 55-16; Doc. # 55-1, 74:14-75:11).

Plaintiff provided a doctor's note to Akal indicating Plaintiff had been seen by a healthcare professional on August 27, 2017 and excusing her from work that day.  (Doc. # 55-1, 79:25-80:6; Doc. # 55-20).  However, Plaintiff received a written warning/PAR on August 30, 2017 for the August 27, 2017 absence and four additional attendance occurrences in a five-week period.  (Doc. # 55-1, 80:10-81:6; Doc. # 55-21).  Plaintiff left work early on July 22, 2017 and was absent on August 5, 16, and 26, 2017.  (Doc. # 55-21).  Plaintiff does not recall why she left work early on July 22 or missed work on August 5, 16 and 26.  (Doc. # 55-1, 80:17-22).  Plaintiff signed the PAR and checked the box indicating she agreed with it.  (Doc. # 55-1, 80:23-81:1; Doc. # 55-21).

Plaintiff received a one-day suspension on February 2, 2018 for absences on December 30, 2017 and January 15, 27, and 30, 2018.  (Doc. # 81:10-16; Doc. # 55-22).  Plaintiff testified that she was generally experiencing depression and anxiety stemming from her miscarriage but did not

7

recall any specifics about why she missed work on the four days that lead to the February 2 PAR. (Doc. # 55-1, 81:17-19, 84:17-85:9, 86:4-12). Plaintiff signed the PAR and checked the box indicating she agreed with it. (Doc. # 55-22).

**D.     Plaintiff's Depression & Anxiety**

Plaintiff testified she began feeling depressed right after her miscarriage in June 2017 and "wasn't quite the same for a long time." (Doc. # 55-1, 85:20-86:3). Plaintiff spoke to Team Managers Kinsey Barton and Danielle Beck about how she was feeling. (Doc. # 55-1, 81:25-82:15, 88:2-22, 109:17-110:2). Plaintiff does not recall the specific details regarding when she spoke with them or what she told them. (*Id.*). Plaintiff recalls that Barton told Plaintiff that Barton had had similar issues, specifically depression and anxiety. (Doc. # 55-1, 88:14-17, 92:2-8).

Barton emailed Plaintiff on February 14, 2018 and provided Plaintiff with FMLA paperwork and the name of Barton's doctor. (Doc. # 55-1, 90:1-25; Doc. # 55-23). Barton told Plaintiff she could get the paperwork completed but that Barton "didn't know how much good it will do because Sledd doesn't believe in depression and anxiety."[2] (Doc. # 62-1, 92:12-18). Plaintiff testified that, because of Barton's comment, Plaintiff did not complete the FMLA paperwork at that time as she was concerned that Sledd would think she was weak. (Doc. # 62-1, 92:12-93:8; Doc. # 55-1, 91:5-7; Doc. # 62, p. 18, ¶ 72).

Plaintiff testified:

---

[2] Defendant objects to the admissibility of this statement as hearsay. (Doc. # 63-2, p. 2, ¶ 8). The standard for determining whether evidence can be considered at the summary judgment stage is whether the evidence could be presented at trial in an admissible form. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). Based on Plaintiff's argument, it appears she is asserting this fact to establish the effect Barton's statement had on Plaintiff's decision not to complete the FMLA paperwork at that time, which would mean Plaintiff was not offering the statement for the truth of the matter asserted. Because this evidence could be presented at trial in an admissible form, the Court will consider it for its limited purpose.

8

I felt I was really good at my job. I knew it very well and work was kind of the one place I had that was my safe place. Because we had an SOP [Standard Operating Procedure] to follow and as long as you followed it, things were fine and I was very confident in myself and my job, so I don't feel like when I was at work how I presented myself would have been an issue because it's the most confident place that I ever went to.

\*　　　\*　　　\*

I was very confident in myself and I didn't – I feel that people look at anxiety and depression as a weakness and I didn't – you know, I was the youngest, the youngest supervisor in the whole airport and I was also a female and I had – I felt like I had an obligation to be the best and to not let anybody down and why would I want to open myself up to something so sensitive for me.

\*　　　\*　　　\*

[I]f I knew anything, it was my job and I felt safe and confident and it wasn't – once I got to work, it wasn't – it wasn't, you know, a huge issue. I would just go about my day once I got there and most days I did fairly well.

\*　　　\*　　　\*

I feel that all the time when I was at work, I was locked in to work because once I got to work, I was okay. But it was getting to work that was the hard part . . . getting up out of bed, trying to control myself, control my thoughts, control my breathing so I could just get up and take a shower.

(Doc. # 55-1, 89:15-25, 92:18-93:1, 100:6-10, 180:5-14).

Plaintiff did not see Barton's doctor but rather saw Dr. Michelle Stone on February 28, 2018. (Doc. # 55-4, 20:13-20). Dr. Stone's record from the February 28, 2018 visit indicates Plaintiff reported she was experiencing anxiety and depression stemming from the June 2017 miscarriage and that Plaintiff "feels like she is having very – or poor motivation." (Doc. # 55-4, 27:18-28:5). Dr. Stone testified that Plaintiff could work, drive a car, and take care of her children and did not believe Plaintiff was "essentially limited in any life activities." (Doc. # 55-4, 31:22-32:8). Dr. Stone also testified that Plaintiff had issues with getting to work, sleeping, feeling tired, and poor appetite or overeating. (Doc. # 55-4, 46:25-47:25). Additionally, Dr. Stone testified that Plaintiff's depression was likely impacting all aspects of her life. (Doc. # 62-2, 46:25-47:25). Dr. Stone diagnosed Plaintiff with generalized anxiety disorder and depression. (Doc. # 62-2, 27:13-28:17; Doc. # 62-1, 20:13-18).

9

Prior to July 8, 2018, Plaintiff was not open with her colleagues, besides Baron and Beck, about her mental health conditions or that she had seen a doctor. (Doc. # 55-1, 101:7-16). She was "generally pretty private" because "before it happened to [her], [she] always saw [mental health issues] as a weakness." (*Id.*).

## E.    May 22, 2018 Three-Day Suspension & Final Warning

Plaintiff received a three-day suspension and final warning on May 22, 2018 for absences on April 17, May 7, and May 14, 2018 and an unapproved early departure on May 15, 2018. (Doc. # 55-1, 98:9-17; Doc. # 55-24). Plaintiff does not recall why she was absent or left early on these days. (Doc. # 55-1, 103:3-6, 104:20-105:3). Plaintiff did not discuss these four absences with her co-workers or supervisors. (Doc. # 55-1, 105:4-15). She testified that she wanted to keep it private and did not want to air her personal issues. (*Id.*). Plaintiff signed the PAR and checked the box indicating she agreed with it. (Doc. # 55-1, 103:7-15; Doc. # 55-24).

## F.    July 11, 2018 Removal from the Schedule

Plaintiff called off on July 1, 2018 due to an adverse reaction to a prescribed medication to treat her anxiety and depression, which resulted in a panic attack. (Doc. # 55-1, 108:8-109:16). At that time, Plaintiff believed she had sufficient PTO to cover the absence. (Doc. # 62-1, 111:13-112:5). Beck told Plaintiff that the system showed she had insufficient PTO to cover the absence. (Doc. # 55-1, 112:13-24).

Seven days later, on Sunday, July 8, 2018 at 9:55 a.m., Plaintiff emailed Sledd:

I know you've received emails about my attendance so I won't beat around the bush here. I am fully aware of my less than great attendance. You have helped me with so much and I am extremely grateful for that . . . By no means am I looking for sympathy or trying to make excuses for my attendance. Saturday evening was the first time I took a prescribed medication and it caused an adverse reaction which resulted in my calling off on Sunday. I have the FMLA paper work but I am too embarrassed to get it fill [sic] out and turned in. Looking at my attendance I know

10

it seems like I don't enjoy my job but that isn't the case at all. I would greatly appreciate your consideration of the circumstances surrounding my call off.

(Doc. # 55-30, p. 2). Sledd replied to Plaintiff on Monday, July 9, 2018 at 11:47 a.m.:

I know you care about the job, I've never doubted that. I'm not going to sugar coat this, I've tried a lot of different things to extend your time to get your attendance settled and it hasn't seemed to work. I'm going to have to remove you from the schedule but I will look at a few different things before deciding to recommend termination. Get the FMLA paperwork completed and bring to me asap. I will wait to see it before I do anything else.

(Doc. # 55-30, p. 3). Beck then emailed Plaintiff FMLA paperwork on July 9, 2018 at 12:20 p.m.

(Doc. # 55-1, 117:15-118:20; Doc. # 55-23). Plaintiff responded to Sledd's email on July 9, 2018

at 2:52 p.m.: "I understand. I contacted my doctor's office today and originally they wouldn't be

able to see me until August. After reaching out to my doctor I was able to get an appointment for

Wednesday [July 11] at 0900." (Doc. # 55-30, p. 2).

Prior to Plaintiff's July 8 emails, Sledd had no knowledge that Plaintiff may have medical

condition that might qualify her for FMLA leave as referenced in that email, had no knowledge of

Plaintiff's anxiety or depression diagnoses, and had had no conversations with any of the Terminal

Managers about Plaintiff's attendance issues. (Doc. # 55-2, 39:3-15; Doc. # 55-1, 169:19-170:17).

On July 11, 2018, Plaintiff worked half of her shift and was then called into Barton's office where

Barton gave Plaintiff the PAR and removed her from the schedule pending investigation. (Doc. #

62-1, 140:16-25). Plaintiff signed the PAR and wrote, "I agree with the occurence [sic] however

am seeking FMLA." (Doc. # 55-1, 107:3-8; Doc. # 55-25). Plaintiff was place on unpaid leave

and remained employed with Akal. (Doc. # 55-2, 65:10-12).

Plaintiff testified that Barton also provided Plaintiff blank FMLA paperwork with a copy

of a job description attached. (Doc. # 62-1, 140:16-25). The instructions on the paperwork

indicated Plaintiff was to complete it and return it to Akal within 15 days. (Doc. # 55-26). Plaintiff

testified that the job description she received with the FMLA paperwork was not any of the various job-related documents in the record of this case. (Doc. # 55-1, 139:13-142:8).

**G.     July 11, 2018 FMLA Paperwork**

Plaintiff saw Dr. Stone again on July 11, 2018, and Dr. Stone completed the FMLA paperwork for Plaintiff and submitted it to Akal. (Doc. # 55-1, 119:24-122:7, 129:18-20; Doc. # 55-26). During July 11, 2018 visit with Dr. Stone, Plaintiff did not communicate any issues to Dr. Stone about having difficulties at work, just difficulties getting to work. (Doc. # 62-2, 45:23-46:4). Dr. Stone's medical record from the July 11, 2018 visit indicates Plaintiff reported "little interest or pleasure doing things," felt tired, had a poor appetite and/or over ate, and had trouble getting to work. (Doc. # 55-4, 47:11-25). The FMLA paperwork indicated Plaintiff could work up to eight hours per day and would need to be off work one day per week from July 11, 2018 to July 10, 2019. (Doc. # 55-26, p. 4). Dr. Stone answered "no" to the question on the FMLA paperwork whether Plaintiff was unable to perform her job functions. (Doc. # 55-4, 67:19-68:3; Doc. # 55-26, p. 2).

Dr. Stone does not recall whether she received a job description with Plaintiff's FMLA paperwork. (Doc. # 55-4, 69:6-70:2). Dr. Stone testified that any job description received should have been saved in the records. (*Id.*). Plaintiff's medical records from St. Luke's did not contain a job description. (Doc. # 55-4, 70:3-8). Plaintiff testified that she provided Dr. Stone with a job description contemporaneously with her FMLA paperwork. (Doc. # 55-1, 137:9-15, 139:13-20). The completed FMLA paperwork indicates that a job description was initially attached to the paperwork when Plaintiff submitted it to Dr. Stone. (Doc. # 55-26, p. 3).

Dr. Stone does not recall talking with Plaintiff about a job description or any specific job functions for Plaintiff's position at the July 11, 2018 visit. (Doc. # 55-4, 70:22-24, 75:12-15).

However, Dr. Stone testified that, when a job description is not provided, she will talk to the patient about their specific job functions. (Doc. # 62-2, 68:20-25). Dr. Stone testified as follows about how she came to her belief that Plaintiff could perform her job functions:

> [I]t's subjective. If you, you know, hers was depression and anxiety, so she's capable of walking at work; she's capable of maybe being on a – answering a telephone, you know, whatever that may be. So when she and I reviewed that, I felt like she was able to perform her job.

(Doc. # 55-4, 68:6-15). Dr. Stone testified that someone dealing with depression and anxiety who feel they are not functioning in their job need to "pull themselves out of that job." (Doc. # 55-4, 78:21-79:3).

Dr. Stone does not recall if she reviewed the TSA Guidelines when she completed the FMLA paperwork for Plaintiff. (Doc. # 55-4, 71:1-25, 74:23-75:10). And Plaintiff does not believe she provided the TSA Guidelines to Dr. Stone for review. (Doc. # 55-1, 137:9-15, 139:13-20). Even after reviewing the medical file at her deposition, Dr. Stone could only guess that Plaintiff worked in airport security for TSA. (Doc. # 55-4, 77:5-25). Dr. Stone testified that she had a "general understanding, and not probably a detailed understanding" of what an airport security officer does and that someone in that type of job dealt with safety. (Doc. # 66-2, 77:5-79:9). Dr. Stone's general description of what an airport security officer does is consistent with a common, layperson's understanding. (*Id.*).

Sledd received Plaintiff's completed FMLA paperwork on July 11, 2018. (Doc. # 62-3, 39:16-24; Doc. # 62-4, 108:17-109:6). He reviewed it and then forwarded it to human resources. (*Id.*).

## H.    Sledd's Investigation & Report to Human Resources

When an employee is removed from the schedule, Sledd is responsible for conducting an investigation. (Doc. # 55-2, 46:17-47:22). Sledd's investigation consists of "going back and

reviewing all of their entire history of discipline, any statements they would have written, gathering any new statements that may be necessary to explain any new occurrence." (*Id.*).

Sledd conducted an investigation when Plaintiff was removed from the schedule in July 2018 and prepared a written report, concluding that Plaintiff "appears to have a condition which would qualify for FMLA however, she never reported this issue to any manager prior to being removed from the schedule. Her attendance remained poor despite PARs and suspensions." (Doc. # 55-2, 47:5-22, 40:24-51:9, 53:20-54:7; Doc. # 55-27). Sledd did not make any recommendations in his investigative report (or at any other time) about what should happen with Plaintiff's employment. (Doc. # 55-2, 83:2-13; Doc. # 55-27). Sledd also included Plaintiff's FMLA paperwork in his investigative report. (Doc. # 55-2, 39:16-24, 60:24-61:4, 67:21-23, 68:2-4).

Sledd forwarded his written report on Plaintiff to Josephine Coker, the employee relations manager and affirmative action manager, in Akal's corporate human resources department on July 18, 2018 for further review and to determine what further action would be taken. (Doc. # 55-2, 49:3-50:1, 53:20-25; Doc. # 55-3, 24:11-25:4; Doc. # 55-27). As employee relations manager, Coker conducts field trainings for managers, handles discipline and termination requests, and processes FMLA requests, among other responsibilities. (Doc. # 55-3, 26:15-27:5). According to Coker, she got involved in reviewing Plaintiff's FMLA paperwork because Plaintiff's situation was unusual. (Doc. # 55-3, 34:4-8). According to Coker:

> The – the reason for removing [Plaintiff] from the schedule was twofold. One, we had a packet that was being submitted, and there was the potential that we would – may be separating her for attendance violations. But at the same time, she submitted a leave under the FMLA request that may impact her ability to perform the essential functions of her job.
>
> So her removal was, in part, you know, to see if we were – what we were going to do going forward. And because we were uncertain with her ability to perform the essential functions of her job, she was – you know, she couldn't work until we could figure that out.

14

The paperwork she submitted for her FMLA didn't cover the period prior to July 11th. So it didn't actually cover her – her – her previous issues. But at the same time, we wanted to give her the benefit of the doubt. So, you know, we had to figure out what essential functions may be impacted, and so we had to get the TSA requirements.

And then there was trying to figure out the process how to get her in for the fitness for duty because the medical center where we do our prehire doesn't actually have someone who could do that. So there was a process trying to figure out what to do with her because this hadn't come up – this particular issue [*i.e.*, the need for psychological fit for duty exam] hadn't come up before with regards – prior to her at that site.

(Doc. # 55-3, 92:21-94:8). Coker reviewed Plaintiff's FMLA paperwork and Sledd's report with her team and decided they needed more information. (Doc. # 55-3, 113:13-21).

The TSA Guidelines have certain requirements for employees experiencing psychological conditions and when medication is involved. (Doc. # 55-3, 113:20-114:3). Coker was concerned Dr. Stone may not have understood what the essential functions of Plaintiff's job were because (a) it did not appear that the TSA Guidelines were included with the FMLA paperwork; (b) FMLA paperwork is not a fitness-for-duty exam; (c) there was nothing included with Plaintiff's FMLA paperwork indicating what Dr. Stone had used to evaluate Plaintiff; and (d) besides an indication that a job description was attached, the FMLA paperwork did not note what job functions Dr. Stone considered when stating that Plaintiff was able to perform her job functions. (Doc. # 55-3, 94:23-95:20, 96:4-10, 112:8-13; Doc. # 55-26, pp. 3-4).

Coker then reviewed the TSA Guidelines for Plaintiff's position and compared it to Plaintiff's FMLA paperwork and determined she (Coker) was not qualified to make the decision about whether Plaintiff could perform the essential functions of her job. (Doc. # 55-3, 113:13-114:13, 116:6-11). Coker decided Plaintiff needed a fitness-for-duty examination. (*Id.*). Coker discovered that the medical provider that does Akal's physical examinations for new hires does

not employ a provider that does psychological examinations. (Doc. # 55-3, 114:12-22). Coker informed her team of this and decided to have Dr. Stone, Plaintiff's physician, perform the fitness-for-duty examination. (*Id.*). Accordingly, Coker prepared and sent Plaintiff a letter on October 24, 2018, asking for her physician to determine if Plaintiff could perform all the essential functions listed in the TSA Guidelines and informing Plaintiff that Akal would work with her if she needed an accommodation. (Doc. # 55-3, 114:20-25, 130:2-11).

Between Plaintiff's removal from the schedule and her receipt of Coker's letter, Plaintiff called Sledd several times to inquire about the status of her employment but was unable to make contact with him. (Doc. # 62-1, 132:15-133:13). Further, Sledd informed Coker that TSA had been requesting information about Plaintiff's status at least two times before the October 24, 2018 letter. (Doc. # 62-4, 121:17-122:11; Doc. # 62-8). As of October 1, 2018, Akal had not hired anyone to take Plaintiff's place. (Doc. # 62-4, 124:24-125:15). Coker testified that Plaintiff's removal was "not considered corrective action under Akal's policy." (Doc. # 62-4, 72:22-73:1).

## I.    Akal's Policy for FMLA Requests

Under Akal's policy for FMLA requests, excusing absences incurred because of a disability and/or a leave of absence can be considered a reasonable accommodation. (Doc. # 62-4, 69:11-70:1). Defendant's accommodation process states that an employee should submit a request in writing and human resources will evaluate it. (Doc. # 62-4, 70:2-13). Coker understood that Akal was supposed to respond to employee requests for FMLA leave within five business days. (Doc. # 62-4, 58:19-60:1).

Regarding the interactive process, Coker testified:

It means that you have a dialogue with the employee going back and forth trying to make sure that you understand what they're asking for and they're understanding what we can and can't do and trying to – it's basically an interaction with the

employee to make sure that we are trying to find a solution for them so that they can work for us.

(Doc. # 62-4, 71:3-12). Pursuant to the policy, if an employee has a condition that may impact their ability to perform the essential functions of their job, the TSA Guidelines should be utilized and submitted to the employee's medical provider. (Doc. # 62-4, 78:10-20).

**J.      Return to Work Letter**

> Coker sent Plaintiff a letter on October 24, 2018, which contained the following:
>
> On July 12, 2018, you were removed from the worksite pending the outcome of an ongoing investigation. During this investigation, you provided documentation regarding a medical condition which may cause episodes in which you may need to be absent from work. This documentation raised concerns that you may have limitations and/or restrictions in regard to performing the essential functions of your job. A copy of the document is enclosed.
>
> At this time, Akal Security, Inc. is requesting you to provide additional medical certification indicating you are capable of performing the essential functions of your job at all times while working. Akal is asking that you obtain medical confirmation of your ability to safely perform your essential job duties, with or without possible accommodation, from the same physician mentioned in the document.
>
> Please note that your requested medical certification is a function of your sensitive position as a Supervisory Transportation Security Officer (STSO) and its possible effect on the client and its staff, your supervisors, your co-workers, and public safety. Rest assured that all medical information requested from the physician will be tailored to STSO job-specific tasks only. The attached documentation outlines your required functions as a STSO in order to guide the physician in his evaluation and any further testing that may be necessary.
>
> *      *      *
>
> Akal is requesting that on or before **November 7, 2018**, you provide Akal a copy of the attached Fitness for Duty Assessment/Return to Work paperwork or notification of an expected assessment date. If for any reason that cannot be done, please let me know immediately.
>
> *      *      *
>
> Please understand that you must visit your physician(s) so that he/she can complete your examination. If you fail to do so, or if you otherwise indicate that you are not going to do so, we may be required to terminate your employment.

(Doc. # 55-28, pp. 2-3) (emphasis in original).  Included with the letter was a copy of the TSA's Guidelines.  (Doc. # 55-1, 136:2-4).  As of the date of the letter, it was still possible for Plaintiff to be put back on the schedule with Akal.  (Doc. # 55-3, 131:21-24).

## K.    Termination of Plaintiff's Employment

Plaintiff did not do the fitness-for-duty examination because she felt she did not have enough time to complete it and because she felt she had already proved that she was fit for duty. (Doc. # 55-1, 136:9-22).  Plaintiff did not contact Akal to request additional time or to tell them she believed Dr. Stone had already provided sufficient information.  (Doc. # 55-1, 136:23-137:8). Plaintiff disregarded Akal's letter and understood her decision could mean she would lose her job. (Doc. # 55-1, 136:23-137:8, 143:9-20).  Akal terminated Plaintiff's employment on November 18, 2018 because she did not complete the fitness for duty exam and return the paperwork as requested in the October 24 letter.  (Doc. # 55-1, 143:24-144:14; Doc. # 55-3, 133:17-22).

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011).  "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact."  *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011).  Essentially, parties resisting a motion for summary judgment must support their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on

18

more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (first alteration in original) (quoting *Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid a summary judgment." *Id.* Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. ANALYSIS

Plaintiff brought the following claims against Defendant: Count I, Disability Discrimination in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010 *et seq.*; Count II, Failure to Accommodate in violation of the MHRA; Count III, Retaliation in violation of the MHRA; and Count IV, Federal Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, Interference; and Count V, FMLA Retaliation. (Doc. # 1-2, pp. 4-22 ("Petition")). Defendant argues each count fails as a matter of law. (Doc. # 55). Plaintiff argues that disputes of material facts preclude summary judgment on Counts I, II, IV, and V. (Doc. # 62).

## A. Abandoned or Waived Claims

In light of recent Missouri case law, Plaintiff expressly abandoned her claims in Count III. (Doc. # 62, pp. 51-52). Defendant is therefore entitled to summary judgment as a matter of law on Count III. *See, e.g., Steadfast Ins. Co. v. Arc Steel, LLC*, No. 16-3214-CV-S-SRB, 2019 WL 2090696, at *1 (W.D. Mo. May 13, 2019) (granting summary judgment on claims expressly abandoned).

Additionally, in her Petition, Plaintiff alleged her discharge was discriminatory, interfered with her FMLA rights, and was in retaliation for exercising her FMLA rights. (Petition, ¶¶ 37, 85, 101). Plaintiff did not respond to any of Defendant's arguments about why Plaintiff's discharge

was not discriminatory or in violation of her FMLA rights.  (*Compare* Doc. # 55, pp. 27-33 (Count I), 38-41 (Count IV), 41-42 (Count V) *with* Doc. # 62, pp. 44-48 (Count I), 52-58 (Count IV), 58-59 (Count V)).  Accordingly, Plaintiff has waived her discharge-related theories of recovery for Counts I, IV, and V.  *See Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 771 (8th Cir. 2014) (argument waived when not addressed in opposition to summary judgment motion).  Summary judgment in Defendant's favor on the discharge-related claims is appropriate.

**B.     Count I, Disability Discrimination**

In Count I, Plaintiff alleges she was subjected to discrimination based on her depression and anxiety in violation of the MHRA.  (Petition, ¶¶ 34-47).  When analyzing claims brought under the MHRA, federal courts "primarily apply Missouri law but may also apply federal employment discrimination law to the extent federal law is applicable and authoritative under the MHRA." *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1019 (8th Cir. 2019) (quotation omitted); *see Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. 2007) (en banc), *abrogated on other grounds by* Mo. Rev. Stat. § 213.101.4 ("In deciding a case under the MHRA, appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law.").

Because Plaintiff has no direct evidence of discrimination, her claim is analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See* Mo. Rev. Stat. § 213.101.3 (2017) (In disability discrimination cases, "the court shall consider the burden-shifting analysis of [*McDonnell Douglas*] and its progeny to be highly persuasive for analysis in cases not involving direct evidence of discrimination.").  Under the burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Olsen v. Cap. Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013).  To establish the prima facie

20

case for disability discrimination under the MHRA, a plaintiff must show that (1) she has a disability; (2) the employer took an adverse action against her; and (3) her disability was the motivating factor in the adverse action. *Hervey v. Mo. Dept. of Corrs.*, 379 S.W.3d 156, 160 (Mo. 2012) (en banc); Mo. Rev. Stat. §§ 213.020(2), 213.055. "The burden then shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lindeman v. St. Luke's Hosp. of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008)). Lastly, "the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014)).

Defendant argues Plaintiff cannot establish she has a disability, and alternatively, Plaintiff cannot demonstrate that Defendant's legitimate, non-discriminatory reason for its adverse action was pretext. (Doc. # 55, pp. 28-33). Regarding removal from the schedule, Plaintiff argues she has a disability within the meaning of the MHRA and that the temporal proximity between when Defendant learned of her disability and the adverse action raises a question of fact regarding pretext. (Doc. # 62, pp. 44-48). Plaintiff additionally claims that Defendant lacks pretext for extending her suspension without pay. (Doc. # 62, pp. 46-48).

### 1.   *Prima Facie Case*

As previously noted, to establish her MHRA disability discrimination claim, Plaintiff must show that (1) she has a disability; (2) the employer took an adverse action against her; and (3) her disability was the motivating factor in the adverse action. *Hervey*, 379 S.W.3d at 160; Mo. Rev. Stat. §§ 213.020(2), 213.055. Under the MHRA, a "disability" is "a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable

accommodation does not interfere with performing the job . . ." Mo. Rev. Stat. § 213.010(5). A mental impairment includes emotional or mental illnesses. Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(A). "Major life activities means those life activities which affect employability such as communication, ambulation, self-care, socialization, education, vocational training, employment and transportation." *Id.* at § 60.3-060(1)(C).

Defendant argues Plaintiff cannot establish she was disabled within the meaning of the MHRA. (Doc. # 55, pp. 28-29). It is undisputed that Dr. Stone diagnosed Plaintiff with depression and generalized anxiety disorder in February 2018. Plaintiff testified that her depression and anxiety sometimes interfered with her ability to get to work, specifically her ability to get out of bed and shower. Dr. Stone testified that Plaintiff was having trouble sleeping, feeling tired, and had poor appetite or overeating. Additionally, Dr. Stone testified that Plaintiff had expressed difficulties in getting to work although Plaintiff could function appropriately once she arrived at work. Viewing these facts in a light most favorable to Plaintiff, a reasonable fact-finder could conclude that Plaintiff's depression and anxiety substantially limited her self-care and/or employment, and thus, that Plaintiff had a disability within the meaning of the MHRA.

### 2. *Legitimate, Non-Discriminatory Reason & Pretext*

Defendant's stated reason for removing Plaintiff from the schedule was that Plaintiff violated the progressive attendance policy through its fifth level, which required removal from the schedule pending investigation. (Doc. # 55, pp. 31-33). Plaintiff argues Defendant's stated reason, although legitimate and nondiscriminatory on its face, is pretext because of the temporal proximity between Plaintiff's July 8, 2018 email and Sledd's decision to remove her from the schedule on July 9, 2018. (Doc. # 62, pp. 45-46). However, "[t]emporal proximity alone is insufficient to

show that an employer's proffered reason for action was a pretext for discrimination." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 634 (8th Cir. 2016).

Moreover, Plaintiff's July 8 email did not include any information about a disability or a particular medication condition, only that she had a negative reaction to a prescribed medication and had FMLA paperwork that she had been too embarrassed to submit earlier. Sledd was otherwise unaware of Plaintiff's depression and anxiety. Thus, as a matter of fact and logic, Sledd could not have considered Plaintiff's disability when he removed her from the schedule. On these facts, no reasonable juror could conclude that the stated reason for Plaintiff's removal from the schedule was pretext for disability discrimination. Summary judgment on Plaintiff's claim that her removal from the schedule was an act of disability discrimination is appropriate in Defendant's favor.

Defendant's stated reasons for extending Plaintiff's suspension without pay was that Plaintiff's situation was unique and presented novel challenges for Sledd and Coker. (Doc. # 63, pp. 5-6). Defendant unquestionably knew about Plaintiff's mental health issues on July 11, 2018, when her completed FMLA paperwork was submitted. Sledd completed his investigation on July 18, 2018 and forwarded the results to Coker on that day. However, Coker did not respond to repeated requests by Sledd regarding the status of Plaintiff's employment and did not initiate any contact with Plaintiff until October 24, 2018. A reasonable jury could find that taking over three months to inform Plaintiff she needed a fitness-for-duty exam was excessive and the unusual circumstances is not a legitimate, non-discriminatory reason for extending her suspension without

pay. Thus, summary judgment is not appropriate on Plaintiff's MHRA discrimination claim for her extended suspension. [3]

## C.    Count II, Failure to Accommodate

In Count II, Plaintiff alleges Defendant failed to accommodate Plaintiff's disability by penalizing her for taking time off work associated with her anxiety and depression. (Petition, ¶¶ 48-60). To support a failure to accommodate claim, a plaintiff "must establish both a prima facie case of discrimination based on [her] disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The "discrimination" is "framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). "In order to determine whether an accommodation is necessary, and if so, what that accommodation may be, the employer and employee must engage in the 'interactive process.'" *Prod. Fabricators*, 763 F.3d at 971 (citation omitted). The employee must show the following to establish the employer failed to participate in the interactive process:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* (citation omitted).

---

[3] Count I also included claims that, in general, any discipline or suspensions she received were adverse employment actions due to her disability. (Petition, ¶ 37). However, Plaintiff did not address Defendant's arguments that disciplines and suspensions prior to July 2018 were not discriminatory. (*Compare* Doc. # 55, pp. 27-33 *with* Doc. # 62, pp. 44-48). Consequently, to the extent Plaintiff alleged claims of disability discrimination for disciplines and suspensions predating July 2018, she has waived argument on those claims, and summary judgment in Defendant's favor on them is appropriate. *See Ames*, 760 F.3d at 771.

Plaintiff argues she requested two separate accommodations: (1) for Defendant to excuse her July 1, 2018 absence; and (2) to be granted intermittent FMLA leave for her anxiety and depression. (Doc. # 62, pp. 48-50). Regarding the first request, Plaintiff sought accommodation only after her absence. And Sledd engaged with Plaintiff, telling her to complete the FMLA paperwork. But requests for accommodation made after a work violation are untimely. *See Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). "An employer is not required to excuse past workplace misconduct even if it is the result of an employee's disability." *Tyner v. Qwest Corp.*, No. 17-3147 (CWF/KMM), 2018 WL 5314947, at *4 (D. Minn. Octo. 26, 2018) (citing *Hill*, 181 F.3d at 894); *see also* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2003-1, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (2002), *available at* https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada, at N:36.

Plaintiff argues she also requested intermittent FMLA leave as an accommodation. (Doc. # 62, pp. 49-50). The uncontroverted evidence establishes Defendant did not respond to Plaintiff's request for nearly four months. A reasonable jury could find that this delay showed Defendant did not proceed in good faith to assist Plaintiff in finding reasonable accommodations.

Defendant argues Plaintiff's requested accommodation was not reasonable. (Doc. # 55, p. 36). "Under Missouri law, whether any particular accommodation is reasonable or unreasonable is dependent on the facts of the individual case." *Baldridge v. Kansas City Public Schools*, 552 S.W.3d 699, 710 n.9 (Mo. Ct. App. 2018). Plaintiff's FMLA paperwork stated she could perform her job duties so long as she could miss work one day per week. Deposition testimony established that excusing absences and granting a medical leave of absence could be reasonable accommodations under Defendant's policies. Further, the evidence established that Akal did not

replace Plaintiff on the schedule until October 1, 2018, at the earliest. A reasonable jury could conclude that, under these circumstances, Plaintiff's request for intermittent leave was reasonable even though the law makes clear that timely and reliable attendance is an essential function of every job. *See Stipe v. Shinseki*, 690 F. Supp. 2d 850, 879 (E.D. Mo. 2010) (holding that chronic tardiness cause by employee's alleged disability rendered her unable to perform an essential function of the job); *Berkey v. Henderson*, 120 F. Supp. 2d 1189, 1193 (S.D. Iowa 2000) ("Habitual tardiness and absenteeism are not disabilities that require employer accommodation . . . Forcing an employer to accommodate unpredictable tardiness or absenteeism is unreasonable even if it is a direct result of the employee's disability."); *Lewis v. N.Y.C. Police Dept.*, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012) ("[C]ourts have specifically noted that the ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability."). As such, Plaintiff's first failure to accommodate claim (*i.e.*, excusing the July 1, 2018 absence) fails but her second claim (*i.e.*, intermittent leave) may proceed.

**D.    Count IV, FMLA Interference**

In Count IV, Plaintiff alleges Defendant interfered with her right to FMLA leave when it (1) failed to inform her of her rights when she suffered a miscarriage in June 2017; (2) penalized her for absences associated with her anxiety and depression; (3) suspended Plaintiff's employment; (4) terminated Plaintiff's employment;[4] and (5) failed to timely process Plaintiff's request for FMLA leave. (Petition, ¶¶ 80-94). "Under the FMLA, employers are prohibited from interfering with, restraining, or denying an employee's exercise or attempted exercise of any right contained in the FMLA." *Quinn v. St. Louis Cty.*, 653 F.3d 745, 753 (8th Cir. 2011) (citing 29 U.S.C. § 2615(a)(1)). To prevail on an FMLA interference claim, a plaintiff must prove: (1) she was entitled

---

[4] As noted *supra*, Plaintiff waived argument that her discharge interfered with her FMLA rights.

to a benefit under the FMLA; (2) that the employer interfered with that entitlement; and (3) that the reason for the denial was connected to the employee's FMLA leave. *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1158 (8th Cir. 2016). Interference includes refusing to authorize FMLA leave, discouraging an employee for using such leave, manipulation to avoid responsibilities under the FMLA, and deterring an employee from participating in seeking FMLA leave. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006). "[A]n employee can prove interference with an FMLA right regardless of the employer's intent." *Id.* However, "a claim for interference will fail unless the employee also shows that the employer's interference prejudiced the employee as the result of a real, remediable impairment of her rights under the FMLA." *Massey-Diez*, 826 F.3d at 1158 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89-90 (2002)). In other words, if the employer would have made the same decision had the employee not exercised her FMLA rights, the employer will not be liable for interference. *Estrada v. Cypress Semiconductor (Minn.) Inc.*, 616 F.3d 866, 871 (8th Cir. 2010).

### 1. *Miscarriage*

Defendant argues Plaintiff's claim regarding her June 2017 miscarriage fails because she suffered no prejudice; she did not notify Defendant she needed, wanted, or was seeking FMLA leave; Defendant could not unilaterally designate her time off as FMLA leave; and the claim is untimely. (Doc. # 55, p. 39). Plaintiff argues that Defendant willfully violated her FMLA rights and therefore the three-year statute-of-limitations applies and her claim is timely. (Doc. # 62, pp. 52-54). Plaintiff also argues she was disciplined as a result of her absences related to the miscarriage and that Defendant's policies show that Defendant should have provided her FMLA paperwork upon learning she had suffered a miscarriage. (*Id.*).

Defendant's attendance policy provided that if an employee had four unexcused absences, including early departures, within a five-week period, the employee was subject to corrective action. (Doc. # 55-8). The uncontroverted evidence establishes that the PAR dated June 19, 2017 indicates that it was given as a result of 12 absences and one unapproved early out. (Doc. # 55-19). Seven of those absences (June 3-5 and 8-11) were related to Plaintiff's miscarriage and Plaintiff provided Defendant with a doctor's note explaining such. (Doc. # 55-29). At least one other absence (May 27) was also excused by a doctor's note. (Doc. # 55-18). Plaintiff admitted during her deposition that three of the absences (May 20, 23, and 24) and the early out (May 22) were unexcused and because of childcare issues. (Doc. # 55-1, 73:21-74:13, 75:15-18). Thus, regardless of whether Defendant excused her absences related to the miscarriage, Plaintiff was still subject to corrective action due to the unexcused attendance issues on May 20, 22, 23, and 24. As such, Plaintiff cannot establish she was prejudiced by the June 19 PAR, even if Defendant did not excuse her absences related to the miscarriage. *See Massey-Diez*, 826 F.3d at 1158; *Estrada*, 616 F.3d at 871. Accordingly, her FMLA interference claim related to the miscarriage is without merit.

Alternatively, Plaintiff's interference claim related to the miscarriage is untimely. Generally, the statute-of-limitations for FMLA claims is two years. 29 U.S.C. § 2617(c). However, if the employer willfully violated the FMLA, the statute-of-limitations is extended to three years. *Id.* A violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hanger v. Lake Cty.*, 390 F.3d 579, 583 (8th Cir. 2004).

Plaintiff argues Defendant had a legal obligation to provide her with FMLA paperwork after she informed Defendant of her miscarriage and Defendant's failure to do so shows it willfully violated the FMLA. (Doc. # 62, p. 53). Although the Eighth Circuit has said that "[a]n employee

28

provides adequate notice to the employer when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave," *Rynders v. Williams*, 650 F.3d 1188, 1196 (8th Cir. 2011) (quotation omitted), the burden to raise the issue of FMLA leave is not entirely on the employer. *See Bosley v. Cargill Meat Sols. Corp.*, 705 F.3d 777, 780-81 (8th Cir. 2013) (noting "rigorous notice standard" for FMLA leave requests and that employees have an "affirmative duty" to indicate the need and reason for the leave). Merely knowing that FMLA leave was in the picture is not sufficient to establish willfulness. *See Hanger*, 390 F.3d at 583-84 (adopting Supreme Court's FLSA willfulness standard for FMLA claims). Given that Plaintiff did not affirmatively request FMLA leave and Defendant merely knew that Plaintiff's medical condition likely qualified for FMLA leave, Plaintiff cannot establish that Defendant willfully violated the FMLA. Summary judgment in Defendant's favor on Plaintiff's FMLA interference claim relating to her miscarriage is appropriate.

### 2. Absences Related to Anxiety/Depression & Suspension

Defendant argues that, because it had no knowledge of Plaintiff's anxiety and depression, it could not have interfered with her FMLA rights prior to receiving her completed FMLA paperwork. (Doc. # 55, p. 40). Plaintiff does not appear to respond to Defendant's arguments on this point. For that reason alone, summary judgment in Defendant's favor is appropriate. *See Ames*, 760 F.3d at 771. However, even if Plaintiff's opposition brief could be read to respond to Defendant's arguments on this issue, it defies logic that Defendant could have interfered with Plaintiff's right to FMLA leave when the decision-makers had no knowledge that Plaintiff may have qualified for FMLA leave in the first place. Moreover, when Plaintiff was provided with FMLA paperwork in February 2018 by a non-decision-maker, she declined to complete it. This indicates Plaintiff did not need or want FMLA leave, further demonstrating that Defendant did not

29

interfere with Plaintiff's right to FMLA leave for her anxiety/depression absences prior to receiving the completed FMLA paperwork.

### 3. *Processing FMLA Paperwork*

Defendant argues that Plaintiff's discharge had nothing to do with her exercise of FMLA rights and that there is no evidence Defendant acted with any intent to deny Plaintiff the FMLA leave to which she was entitled. (Doc. # 55, pp. 40-41). Plaintiff argues that Defendant interfered with her FMLA rights by impermissibly delaying her return to work during her extended suspension, which caused her prejudice. (Doc. # 62, pp. 54-58).

First, "[t]he employer's intent is immaterial to an FMLA interference claim." *Massey-Diez*, 826 F.3d at 1158. Second, the applicable FMLA regulations provide that an employer "must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days" after receiving enough information to determine whether the leave qualifies for FMLA protection. 29 C.F.R. § 825.300(d)(1). If the employer determines a fitness-for-duty certification is necessary, the employer must notify the employee of such requirement with the designation notice. *Id.* at § 825.300(d)(3). "Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Id.* at § 825.300(e). If the employer finds the certification incomplete or insufficient, the employer must inform the employee in writing what additional information is required. 29 C.F.R. § 825.305(c).

It is undisputed that Plaintiff had a qualifying medical condition and that Defendant received Plaintiff's completed FMLA paperwork on July 11, 2018. It is also undisputed that Defendant did not provide any response to Plaintiff on her FMLA request until October 24, 2018, when it requested she undergo a fitness-for-duty examination. A reasonable jury could determine

the significant delay between Defendant's receipt of Plaintiff's completed FMLA paperwork and its request for a fitness-for-duty certification establishes Defendant actually interfered with Plaintiff's FMLA rights.

At the very least, the delay establishes Defendant technically violated the FMLA. "Technical violations of the FMLA are not actionable unless they harm the employee." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 521 (8th Cir. 2015). Plaintiff remained suspended without pay until her ultimate discharge due to Defendant's violation of FMLA regulations. That Plaintiff's suspension was without pay raises material questions about whether Defendant's violation prejudiced Plaintiff. As such, summary judgment is not proper on Plaintiff's FMLA interference claims relating to Defendant's failure to timely process paperwork.

### E.     Count V, FMLA Retaliation

In Count V, Plaintiff alleges Defendant retaliated against her for requesting FMLA leave by removing her from the schedule and discharging her.[5] (Petition, ¶¶ 95-109). FMLA retaliation claims are analyzed under the *McDonnell-Douglas* burden-shifting framework. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011). To establish the prima facie FMLA retaliation case, a plaintiff must show that "1) he engaged in protected conduct; 2) he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1117 (8th Cir. 2012). For purposes of this Order, the Court assumes Plaintiff has established the prima facie case for FMLA retaliation for her suspension.

---

[5] As previously noted, Plaintiff waived her claim that her discharge was in retaliation for seeking FMLA leave.

Next, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Lindeman*, 899 F.3d at 606. As discussed with her disability discrimination claim relating to her suspension, Defendant has done so. Defendant's stated reason for removing Plaintiff from the schedule was that Plaintiff violated the progressive attendance policy through its fifth level, which required removal from the schedule pending investigation.

Because Defendant has articulated legitimate, nondiscriminatory reasons for Plaintiff's removal from the schedule, the burden returns to Plaintiff to show these reasons are merely pretextual. *Prod. Fabricators*, 763 F.3d at 969. Plaintiff incorporates her arguments concerning pretext in the context of her MHRA disability discrimination claim. (Doc. # 62, p. 59). There, she argued that the temporal proximity between when Defendant learned of her disability and the adverse action raises a question of fact regarding pretext. (Doc. # 62, pp. 44-48). But here, it is the proximity between when Defendant learned of her requested FMLA leave and the adverse employment action.

As discussed in Section III.B.2 above, Sledd did not learn of Plaintiff's disability until after she was removed from the schedule. However, Sledd arguably learned of Plaintiff's intent to seek FMLA leave prior to removing her from the schedule. Three days passed between Plaintiff informing Sledd she had FMLA paperwork and Sledd removing her from the schedule. Although temporal proximity alone cannot establish pretext, *Kelleher*, 817 F.3d at 634, "it may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence." *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 909 (8th Cir. 2015) (quotation and alteration omitted). "[W]here an employer has known about its stated reason for taking adverse action against an employee for an extended period of time, but only acts after the employee engages in protected activity, the employer's earlier inaction supports an inference of

32

pretext." *Id.* at 910. Plaintiff's unexcused call-out that prompted her removal from the schedule occurred on July 1, 2018. However, ten days passed before Defendant removed her from the schedule on July 11, just three days after she reported she intended to seek FMLA leave. Given these facts, a genuine dispute exists regarding whether a prohibited reason, rather than Defendant's stated reason, actually motivated Plaintiff's suspension. *Id.* (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011)).

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff's Count I claims regarding disciplines and suspensions predating July 2018, her removal from the schedule, and her termination are without merit. However, her Count I claim regarding her extended suspension without pay survives. Plaintiff's Count II claim that Defendant failed to accommodate her by not excusing her July 1, 2018 is without merit but material disputes remain regarding the claim that Defendant failed to accommodate her request for intermittent leave. Plaintiff abandoned Count III. Regarding Count IV, Plaintiff's claim that Defendant interfered with her FMLA rights by not timely processing her request for FMLA leave survives but her other claims fail. Finally, material disputes preclude summary judgment on the Count V claim regarding her removal from the schedule, but Plaintiff waived her Count V claim regarding her discharge. Accordingly, it is

ORDERED that Defendant's Motion for Summary Judgment is DENIED on the following claims: Count I claim regarding extended suspension without pay; Count II claim regarding request for intermittent leave; Count IV claim regarding failure to timely process FMLA request; and Count V claim regarding removal from the schedule.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is GRANTED in Defendant's favor on all remaining claims.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED:  August 31, 2021